**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| v.                              ) | 1:14cr12-1 |
| ) | **Electronic Filing** |
| **DOHERTY KUSHIMO**       ) | |

## MEMORANDUM ORDER

AND NOW, this 30th day of December, 2022, upon due consideration of [872] Doherty Kushimo's (the "defendant") renewed "emergency" motion for compassionate release and [874] supplement thereto, which renewed motion identifies additional medical and other conditions in support of [869] his initial motion for such relief, IT IS ORDERED that the motion as supplemented be, and the same hereby is, DENIED.

Defendant pled guilty to one count of conspiracy to commit fraud in violation of 18 U.S.C. § 1349 and nine counts of aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1). He was sentenced to 72 months' imprisonment at count one and a consecutive 24-month sentence on the identity theft counts, for a total term of 96 months, and ordered to pay $335,725 in restitution. Thereafter, defendant filed the motion for compassionate release and supplemental submissions now pending before the court.

Section 601(b) of the First Step Act of 2018 made modifications to 18 U.S.C. § 3582, which previously authorized the Director of the Bureau of Prisons to file a motion with the court to modify a term of imprisonment that had already been imposed where "extraordinary and compelling reasons warrant[ed] such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). While defendant indicates that the warden at FMC Devens denied his first request for compassionate release, Section 601(b) of the First Step Act authorized prisoners to present such motions for

"compassionate release" directly to the court. Defendant has requested relief pursuant to such a motion.

In support of his motion, defendant identifies what he characterizes as a number of "extraordinary and compelling reasons," which he asserts are unique and warrant relief under an individualized assessment. These include (1) his risk of severe illness and/or complications from COVID-19[1] due to being 58 years of age[2] and suffering from obesity, cardiac disease, high blood pressure and hyperlipidemia; (2) the rapid spread of COVID-19 at FMC Devens[3] and the purported inability of the facility to properly contain the virus and protect inmates like defendant due to its "ineffective" policies and procedures; (3) defendant not being a danger to others or the community; and (4) his purported "satisfaction" of the § 3553(a) factors.

Defendant has failed to demonstrate that the court should exercise its discretion and grant the relief he seeks. The compassionate release provision states that a district court "may reduce the term of imprisonment" and "impose a term of probation or supervised release" if it finds that "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). Before granting compassionate release, a district court must consider "the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable." § 3582(c)(1)(A). Those factors include, among other things, "the nature and circumstances of the offense and the history and characteristics of the defendant," § 3553(a)(1), and the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just

---

[1] The novel coronavirus, or SARS-CoV-2, is a virus that spreads through exposure to respiratory fluids such as droplets or aerosol particles. See https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html. The disease that can result from exposure is known as COVID-19, which was first identified by the World Health Organization on February 11, 2020. https://www.cdc.gov/coronavirus/2019-ncov/your-health/about-covid-19/basics-covid-19.html.
[2] Defendant was 58 years old when he filed his initial motion on June 30, 2020.
[3] Defendant is no longer housed at FMC Devens. The record indicates that he was transferred to FCI Allentown Low on March 29, 2022. The BOP website also reflects this transfer.

2

punishment for the offense"; "to afford adequate deterrence to criminal conduct"; and "to protect the public from further crimes of the defendant," § 3553(a)(2)(A)-(C).

On balance, review of the available information pursuant to the relevant factors does not warrant the relief defendant seeks. At the time that the final presentence investigation report was filed on January 4, 2017, see Doc. No. 600, "defendant reported that his physical health [was] good but that he [took] 5 mg of Lisinopril daily for high blood pressure." The initial "emergency motion" was filed on June 30, 2020, see Doc. No. 869, and in a little over three and a half years' time defendant reported that in addition to having high blood pressure, he was also suffering from obesity, cardiac disease, and hyperlipidemia (i.e., high cholesterol). If proven to be true, the court recognizes that the conditions of age, obesity, cardiac disease, and high blood pressure could and likely do place him at heightened risk for more severe complications from COVID-19. See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (identifying advanced age, heart disease and *possibly high blood pressure*[4] as conditions which increase the risk for more severe complications and outcomes from COVID-19 disease). However, the court has not been provided with any documentation, such as medical records, to support defendant's claims that he now is suffering from the asserted additional above-referenced medical conditions.

To the contrary, as evidenced by the prison's medical records attached to the government's response to the initial motion (Doc. No. 871), the defendant *may* suffer from

---

[4] The CDC distinguishes between pulmonary hypertension and "regular" hypertension. Id. While pulmonary hypertension (high blood pressure in the lungs) is listed as "a chronic lung disease that can make one more likely to get very sick from COVID-19," "regular" hypertension is only seen as *possibly* making an individual more susceptible to severe illness from COVID-19. Id.

prehypertension, but there is no documentation to support his other claims. On June 3, 2020,[5] defendant approached a medical provider requesting his blood pressure to be checked due to an increase in the number of headaches he was experiencing. Id. While his blood pressure was slightly elevated on that day, the doctor reviewing his file on June 4, 2020, noted that "[i]n light of recent contraband recover from Camp, new BP elevation somewhat suggestive."[6] Id. The next day, on June 5, 2020, defendant again sought medical attention and requested his blood pressure to be taken, which did not reflect abnormal findings. Id. The attending medical professional noted "[h]e has 1 reading of an elevated BP." Id. On June 11, 2020, defendant again asked a physician to take his blood pressure and indicated that "he used to be on Lisinopril but stopped it . . . . ." Id. The notes from that specific visit indicate "prehypertension, with a fervent wish to be treated. I suspect secondary gain (looking for eHC due to still non-existent elevated risk of severe Covid infection were he to contract the virus)." Id. Therefore, defendant's medical records at best support a finding of possible prehypertension.

Moreover, the final presentence investigation report indicates that defendant weighed approximately 216 pounds at the time of sentencing. It is important to note that defendant's prison medical records from June of 2020 reveal that defendant then weighed 207.2 pounds, a reported loss of 8.8 pounds. There is no indication that this reduction in weigh was due to uncontrolled medical conditions that would enhance defendant's susceptibility to COVID-19 or a more severe outcome from the disease.

---

[5] This date was 27 days before defendant filed the initial motion and exactly 30 days after being notified by his social worker that his request for compassionate release consideration was denied by the Warden of FMC Devens.

[6] The court is unaware of what contraband was recovered from the Camp or precisely how it would have impacted the defendant's blood pressure reading on that specific day. Nevertheless, the doctor's note implies that the contraband was a substance known to elevate blood pressure.

4

To be sure, the court is cognizant that defendant's risk of infection and the potential for severe complications is exacerbated by the general living conditions created within the institutional setting. Thus, even if the defendant provided proper medical documentation that he suffered from medical conditions that could rise to the level of and provide a basis for the existence of extraordinary and compelling circumstances, these conditions are not the sum-total of what the court must consider. But even assuming that such a showing has been made, the remaining information available meaningfully undercuts defendant's request for compassionate release.

First, the enhanced risks defendant faces within the institution must be balanced against the Bureau of Prisons' persistent and ongoing efforts to control outbreaks of the disease and implement measures that fulfill its statutory obligation to provide inmates with a safe environment and needed medical care. See https://www.bop.gov/coronavirus; accord United States v. Raia, 954 F.3d 594, 596 (3d Cir. 2020) ("We do not mean to minimize the risks that COVID-19 poses in the federal prison system, particularly for inmates like Raia. But the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread.") (citing the BOP's COVID-19 Action Plan); United States v. Stallings, 2020 WL 3619071, *4 (M.D. Pa. July 2, 2020) (extensive efforts of BOP in preventing and controlling outbreaks of COVID-19 properly are considered in assessing its ability to manage an inmate's institutional and medical needs). That plan has involved modified operations since the initial outbreak of COVID-19, *see* BOP Modified Operations (https://www.bop.gov/coronavirus/covid19_status.jsp), along with refined measures that have been informed by collaboration with the Coronavirus Task Force, the Center for Disease Control and the COVID-19 Vaccine/Therapeutics Operation.

https://www.bop.gov/coronavirus. As of December 21, 2022, the BOP reports having 145,350 federal inmates in BOP-managed institutions and 13,921 in community-based facilities. Its staff complement is approximately 36,000. It has about 203 federal inmates and 190 BOP staff who have "confirmed" positive test results for COVID-19 nationwide. Currently, 47,416 inmates and 14,722 staff have recovered. There have been 309 federal inmate deaths and 7 BOP staff-member deaths attributed to COVID-19 disease. Of the inmate deaths, 11 occurred while on home confinement. Id. These statistics appear to be the product of a reasonable response to and management of the risks posed by the relentless SARS-CoV-2 and its ongoing mutations.

More specifically, defendant was housed at FMC Devens when he initially filed this petition.[7] However, according to defendant's most recent submissions, he was transferred to FCI Allentown Low on March 29, 2022. FCI Allentown Low has only experienced one inmate death; it also had 409 inmates and 23 staff members who have recovered from COVID-19. Id. As of this date, the facility is not reporting any positive tests among inmates or staff. Id. These circumstances further undercut the current and recurrent degree of risk which defendant faces. Cf. United States v. Henderson, -- F. Appx. --, --, 2021 WL 2156910, *2 (3d Cir. May 27, 2021) ("As the [District] Court explained, the outbreak of COVID-19 at FCC-Allenwood (where Henderson was housed) had been contained and, at the time of the decision, there was only 1 active case at the prison complex. Thus, the risk of Henderson contracting COVID-19 was low and did not constitute an "extraordinary and compelling reason" for a sentence reduction.").

Moreover, the BOP's modified operations plan has included a roll-out of the available vaccines to staff and inmates. To date, the BOP has been able to administer over 343,226 doses

---

[7] FMC Devens currently is reporting 2 positive tests among inmates and 3 positive tests among staff members. It also reports that 362 inmates and 280 staff members have recovered from COVID-19. Id.

6

of COVID-19 vaccine to both staff and inmates throughout the nation. Id.[8] After the administration of over 660 million doses of the available COVID-19 vaccines under the current emergency authorizations, the CDC continues to report that they are safe and effective. See https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/safety-of-vaccines.html. General side effects are minimal and minor and serious adverse reactions have been rare. Id. Indeed, anaphylaxis can be treated and successfully controlled shortly after injection through established medical protocol and the rare response of thrombosis with Thrombocytopenia Syndrome after receiving the J &J vaccine occurs in women at the rate of approximately seven cases per one million vaccinated individuals. Id. The ongoing availability of the vaccines and their concomitant safety record further diminish the risk of severe sickness or death to all of the inmates under the BOP's care, including defendant. Cf. https://www.bop.gov/coronavirus (noting the increase in control of the virus from the BOP's ongoing roll-out efforts); https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/work.html (noting the effectiveness of the approved vaccines against severe illness, complications and death among all age groups).

Against this backdrop, a decision to reject vaccination cannot displace the diminishing effects that the availability of the vaccines have had on the risks facing inmates such as defendant. Absent some compelling justification, the insidious decision to decline the vaccine when offered by the BOP negates an inmate's basic contention that release is warranted due to the existence of extraordinary and compelling medical reasons. See United States v. Jackson, 2021 WL 1145903, *2 (E.D. Pa., March 25, 2021) ("Where Jackson bears the burden of demonstrating her entitlement to relief, the Court finds that her unexplained refusal to accept a

---

[8] This number does not include staff who received their vaccines through a community provider. Id.

COVID-19 vaccination when offered negates her otherwise compelling medical reasons for release.") (collecting cases in support); United States v. Austin, 2021 WL 1137987, *2 (E.D. Mich. March 25, 2021) ("A prisoner cannot on the one hand point to the risk of severe illness, while on the other hand refuse to participate in basic precautionary measures such as vaccination.").

In short, while defendant's age and alleged medical conditions could create real risks for contracting COVID-19, and to a lesser degree, developing complications resulting in severe illness and/or death, the potential for these risks to materialize must be viewed through the lens of the BOP's ongoing response to the SARS-CoV-2 and its efforts to provide for defendant's medical needs. Viewed in this context, defendant has not met his burden of demonstrating extraordinary and compelling circumstances warranting his immediate release.

Even assuming for the sake of argument that defendant has presented medical conditions that substantially affect his vulnerability to severe complications in the event he contracts COVID-19, relief still is inappropriate after balancing the applicable § 3553(a) factors. As discussed in more detail in this court' tentative findings and rulings (Doc. No. 770), defendant extensively was involved in aggravated identify theft and a sophisticated and vast conspiracy to commit wire fraud. The conspiracy charged at count one encompassed an intricate and well-orchestrated scheme to obtain stolen identification information and utilize it to obtain money through the filing of fraudulent income tax returns, the cashing of counterfeit checks and the acquisition and use of unauthorized access devises. To do this the co-conspirators worked together to 1) acquire stolen identity information; 2) create false identification documents such as state driver's licenses, utility bills and similar documents/forms of identification; 3) open bank accounts into which tax refunds, cash and other instruments of payment could be deposited; 4)

withdraw the funds from the bank accounts upon availability; and 5) distribute the proceeds among those involved with the particular account or transaction.

Numerous individuals fulfilled distinct tasks in accomplishing these goals. These included 1) acquiring the stolen identification information; 2) identifying addresses which could be used to perpetuate the scheme; 3) creating fictitious forms of identification; 4) opening bank accounts; 5) creating and filing false income tax returns; 6) tracking the processing of those returns by the Internal Revenue Service; 7) liquidating the forms of payment received; and 8) distributing the proceeds to those involved. The co-conspirators lived in multiple states and their activities occurred at various locations throughout the United States.

The false income tax return portion of the scheme involved three distinct components: the fuel farm loss scheme; the fuel tax scheme and the earned income scheme (collectively "the tax scheme"). Devising the fuel farm loss scheme required the submission of fairly complicated tax returns that reflected knowledge and effort commonly possessed by a trained tax preparer, such as a certified public accountant. The fuel tax and earned income schemes were not as detailed and less sophisticated.

In gathering stolen identification information to perpetuate the tax scheme the conspirators focused on acquiring stolen identities that would avoid detection. Thus, the identities were gathered from or cross-checked against sources such as recipients of public welfare benefits and inmates serving periods of incarceration. Using such identities significantly reduced the chances of the IRS receiving a legitimate income tax return from the individual victim and thus becoming aware that a fraudulent return had been filed. The conspirators likewise utilized credit reporting services to determine which individuals had favorable credit scores and would be extended credit through applications for credit cards. These means were used to advance simultaneously the

objectives of the scheme and avoid detection by government authorities and/or financial institutions.

The record clearly demonstrates that defendant had a central role in the conspiracy. He undertook to open hundreds of bank accounts with stolen identity information and was successful on a great number of occasions. He opened and/or controlled access to bank accounts that were utilized by other co-conspirators to file false income tax returns. Withdrawals from a number of these accounts were traced to locations in Providence, Rhode Island, where defendant resided, and others were traced to the New York area where a significant co-defendant resided. In the span of 10 months defendant had contacted approximately 100 different financial institutions across the United States in furtherance of the scheme. One cellular telephone number alone was used to contact over 70 different financial institutions in 22 different states. He also acquired thousands of unauthorized access devices as part of the conspiracy and had over 1,100 credit cards in his possession when his residence was searched. Information derived from the search of defendant's internet communications connected him to the exchange of thousands of stolen identities. The search at a co-defendant's residence connected defendant to hundreds of additional bank accounts and credit cards that were opened/obtained using stolen identities.

Ultimately, this elaborate identity theft conspiracy implicated over 11,000 individuals' identities and an attempted loss of at least $69,936,117.00, with the total loss attributable to defendant being $7,461,713.97. Defendant pled guilty to one count of conspiracy to commit wire fraud, from in and around December 2005 to in and around November 2014, and nine counts of aggravated identity theft, from in or around March of 2011 to in and around October of 2012. Therefore, while defendant claims that he was "convicted of non-violent white-collar offenses" and "[he] is not a danger to the safety of others or to the community," defendant's

offense conduct provides strong justification for the sentence originally imposed.  At sentencing, this court emphasized how serious this case was due to the number of victims and the amount of intended loss.  Defendant appealed this court's sentence, and the United States Court of Appeals for the Third Circuit Court of Appeals affirmed.  See Doc. No. 848.

The offense was serious, there was and is a real need to deter others from engaging in similar criminal conduct, and there remains a meaningful need to protect the public from future crimes by defendant.  Defendant's plan of re-integration (which contemplates moving back to Rhode Island to reside with his wife while being placed on home confinement in lieu of serving additional time at a BOP institution) does not diminish these penological needs.  In other words, defendant's plans do not displace the import of the many factors that support maintaining the sentence as originally imposed.

The guidelines were extensively considered in the court's sentencing of defendant.  In light of the criminal conduct at issue and defendant's criminal history, the defendant's guidelines sentencing range was 97 to 121 months at count one and at least one 24-month consecutive sentence at the remaining counts.  In consideration of the guidelines, this court sentenced defendant to 72 months' imprisonment and a consecutive 24-month sentence on the identity theft counts, for a total term of 96 months.  Nothing has been presented to suggest that the offense conduct would somehow be treated less harshly today, especially after recognizing that the defendant's sentence was *below* the guideline range.

In short, a review and re-evaluation of the § 3553(a) factors continues to favor the original sentence, even when balanced against the increased risks presented by defendant's medical conditions vis-a-vis the current public health crisis.  Consequently, his motion for relief

11

pursuant to the CARES Act has properly been denied.

s/David Stewart Cercone
David Stewart Cercone
Senior United States District Judge

cc:    Christian A. Trabold, AUSA

(*Via CM/ECF Electronic Mail*)

Doherty Kushimo
Register #09728-070
FCI Allentown Low
P. O. Box 1000
White Deer, PA 17887

(*Via First Class Mail*)